14604

HORTON v. ATLANTIC LIFE INS. CO.

(197 S. E., 512)

156

*Messrs. Carlisle, Brown & Carlisle* and *A. B. Scott,* for appellant,

*Messrs. Johnson & Johnson* and *J. Davis Kerr,* for respondent,

June 7, 1938.

Per curiam.

On July 29, 1920, the defendant company insured the life of one Linsay A. Horton, then thirty-seven years of age, in the sum of $2,000.00. A double indemnity agreement was attached to the policy, which provided that the company would pay an additional amount equal to the face value of the contract in the event of accidental death of the insured before attaining the rated age of sixty-five years. The payment of disability benefits, in case Horton became totally and permanently disabled before reaching the rated age of sixty years, was also provided for. On August 17, 1921, in compliance with the request of the insured, the company issued and attached to the policy a statement that, in consideration of the payment in advance of $8.47 to cover the cost of temporary insurance, it was agreed that the annual premiums thereafter should be due and payable on the 29th day of November of each year, as if that date had originally been inserted in the contract of insurance and the double indemnity agreement. The annual premium on the policy, as provided therein, was the sum of $58.80, with an additional annual premium of $3.00 on the double indemnity agreement. The insured paid all premiums up to and including the annual premiums of November 29, 1932, but made default in the payment of the premiums due November 29, 1933. Horton died on May 26, 1934, and notice of his death was given the company on the 14th of the following month, at which time demand was also made for payment of the insurance. The company refused to comply with the request,

and this action was then brought to enforce collection of the policy.

The plaintiff alleged that on November 29, 1933, the reserve value of the contract of insurance was the sum of $400.04; that the insured had received a loan from the company amounting to $380.00 as of November 29, 1933, leaving a net balance, applicable to the purchase of extended term insurance, of $24.86, the difference between the net reserve and the indebtedness of the insured, plus a dividend of $4.82 apportioned to the credit of the policy on November 29, 1933.

The defendant admitted that it had issued the policy sued upon, but alleged that Horton's indebtedness of $380.00 against the contract was the entire and full extent of the policy's available value on November 29, 1933; and that when such indebtedness was deducted from the net reserve, there was no remaining value of any kind whatsoever with which to purchase extended term insurance.

By consent of the parties, the case was tried without a jury by Judge Merchant, who filed an order on September 11, 1937, giving judgment for the plaintiff for the full amount sued for. From this order and judgment the defendant appeals.

Was the contract in force at the death of Horton as extended term insurance?

The policy provides that it was issued in consideration of the payment of $58.80 in advance, "as the premium for an insurance terminating one year from the date hereof, and will be renewed and extended thereafter as a life contract upon the further payment of a like amount due one year from the date hereof and on the same anniversary day in every year thereafter and payable on said date annually or within the grace period as above provided." It also provides, under its automatic nonforfeiture provision, that "upon the nonpayment of any premium after the second, without action on the part of the insured, the company will advance

such premium, also subsequent unpaid premiums, with interest at 6% per annum due annually in advance, as a premium loan secured by this contract, so long as such loan together with all indebtedness and with interest at 6% per annum due annually in advance does not exceed the cash value of this contract, plus any dividends on deposit. * * * If the available cash value be insufficient to pay an annual premium and interest as above stated, the company will continue the contract as extended term insurance for such time as the balance of value will permit." The provision of the policy relating to extended insurance sets forth that the amount of this insurance shall be "as stated in the table of surrender values" contained in the policy; and that "such values are based upon the reserve by the American Experience Table of Mortality with 3½% interest." It was also provided that "any indebtedness to the company on account of this contract * * * will be deducted from the reserve used in the calculation of any benefit provided therein." The table of surrender values printed in the policy indicates that after the contract had been in force for full thirteen years, its cash surrender or loan value would be $190.00 per thousand, making its reserve or cash value, according to this table, on the date named, the sum of $380.00.

The contention of the respondent is that this policy is a level premium policy, that is, the annual premium remains the same throughout the life of the policy; and that the value of the contract for the purpose of extended term insurance, aside from dividend accumulation, should be the reserve by the American Experience Table of Mortality with 3½% interest on a life continuous premium basis. The contention of the appellant is that the reserve should be computed by the American Experience Table of Mortality for 3½% interest as modified by a full preliminary term of one year in addition to the four months' term insurance provided by the supplemental application. In other words, the

company says that the policy had no reserve for the first sixteen months or until the year following November 29, 1921, as the contract provides that its value should be "as stated in table of surrender values," namely, $380.00, such value being arrived at by the full preliminary term method of calculating reserves; while the plaintiff contends that the policy provides for values to be arrived at by the full level premium method of making such calculation.

It would seem, therefore, that the real question before us is whether the table contained in the policy, or the one relied upon by the respondent, controls. In the lower Court this question was made by the introduction in evidence by the plaintiff, over the objection of the defendant, the table contended for by him, and its adoption by the Court as the controlling basis of the calculation of the value of the policy at the time the lapse occurred.

We have given much thought and consideration to this question, and have reached the conclusion, and so hold, that the table contained in the policy, in the absence of any showing of mistake or fraud, must control. The interpretation by the insurer of the American Experience Table of Mortality, and its application in this case, is expressed in the policy itself. As a matter of fact, the expression, "American Experience Table of Mortality," is a composite term, applicable to a series of tables dealing with life insurance, costs and values, varying according to (1) the age of the insured, (2) the period during which the policy has been in force, and (3) the term of the particular policy as affecting the insured's expenses and costs when distributed over the probable life of the policy. When it is attempted, therefore, to apply such tables to a given contract of insurance, the terms of such contract must of necessity have a bearing upon the policy values deducible from the tables. For example, it would not be contended that a given table, when applied to a one-year term, renewable policy, would produce the same result as when compared to a continuous

life payment or endowment policy. Separate tables apply to the different types of policies, and the one relied upon in a given case must be shown to fit the policy in question. In each case, therefore, it may be necessary to apply a different table or method of calculation.

R. P. James, an actuary in the employment of the defendant company, was the only witness called to the stand. Testifying as an expert in the field of insurance, he stated that, treating the present contract as a term policy, renewable as provided therein, the applicable method of calculation based upon the American Experience Mortality Table with $3\frac{1}{2}\%$ interest, produces the exact result set out in the table of surrender values contained in the policy, and that this method of calculation is known as "the full preliminary term method." He further stated that if the contract of insurance were a straight life policy rather than a term policy, renewable, a method of calculation known as "the full level premium method," would be applicable, and in that event, under the American Experience Mortality Table in question, the figures or table upon which the respondent relies would be correct.

The ultimate issue in the case, therefore, is whether the table of extended values, which constitutes a part of the policy itself, can be wholly disregarded, and in its place another table substituted. Assuming, without deciding, that this might be done if it were shown that the policy table is contrary to the applicable method of calculation based upon the American Experience Table of Mortality, it is clear that it cannot be done in this case without making a new contract between the parties. The policy is not ambiguous; it merely represents, as a fact, that the table of surrender values contained therein is based upon the American Experience Table of Mortality, and the testimony of the only qualified witness, who explained the applicability of the methods of calculation based upon that table, is to the effect that the representation in the policy is correct.

While it is true, as contended by the respondent, that ambiguous provisions in a contract of life insurance will be construed liberally in favor of the insured, we find no ambiguity in the policy before us calling for the application of that rule. The explicit statement in the contract as to the amount of extended insurance that would be available in the event of a lapse involves no ambiguity; and no attempt has been made to impeach the policy table or the conduct of the appellant on any ground that would justify the introduction of extrinsic evidence to extend the term of the contract beyond the time expressed in the table. Moreover, the insured had possession of the policy from July, 1920, to May, 1934, and must be charged, therefore, with full knowledge of the specific amount of the extended insurance available to him as set forth in the contract itself.

The judgment of the Court below is reversed.

MR. JUSTICE CARTER did not participate on account of illness.